## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

---

| |
|---|
GREGORY L. DIXON
1522 Winfields Lane
Gambrills, MD 21054
(Anne Arundel County)

       *Plaintiff*,

v.

BOOZ ALLEN HAMILTON, INC.
8283 Greensboro Drive
McLean, VA 22102
(Fairfax County)

and

IAN, EVAN, & ALEXANDER CORPORATION
d/b/a EVERWATCH CORP.
11180 Sunrise Valley Drive
Reston, VA 20191
(Fairfax County)

       *Defendants*.

Case No.: 1:23-cv-483

---

## COMPLAINT

Plaintiff Gregory L. Dixon (referred to herein as "Mr. Dixon" and "Executive"), through counsel, hereby brings this action against Defendants Booz Allen Hamilton, Inc. ("BAH") and Ian, Evan & Alexander Corporation d/b/a/ EverWatch Corp. ("EverWatch" and collectively with BAH referred to herein as the "Defendants"), and alleges as follows:

## SUMMARY

1.      This matter concerns Mr. Dixon's Employment Agreement dated July 1st, 2019, and the Amendment dated May 2nd, 2022 (referred to herein as the "Employment Agreement") (attached, with Exhibit A).

1

2. The Defendants assert that Mr. Dixon voluntarily resigned and is not entitled to severance under Section 6.3 of the Employment Agreement.

3. Mr. Dixon claims that he was terminated without Cause by the Defendants and is entitled to severance pursuant to Section 6.3 of the Employment Agreement.

## PARTIES

4. Mr. Dixon is an individual residing in Anne Arundel County, Maryland. Mr. Dixon entered into an Employment Agreement on July 1, 2019 with Analysis, Computing & Engineering Solutions, Inc. ("ACES, Inc.") a Maryland Corporation and a subsidiary of EverWatch Corp.

5. Defendant Ian, Evan & Alexander Corporation d/b/a/ EverWatch Corp. ("EverWatch") is headquartered in Reston, Virginia. EverWatch provides services to the defense and intelligence community focused on data science, system engineering, intelligence, and cybersecurity.

6. Defendant Booz Allen Hamilton, Inc. ("BAH") is headquartered in McLean, Virginia. BAH acquired EverWatch as of October 14, 2022 and is now a wholly owned subsidiary.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this matter under 28 U.S.C. § 1332 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. The parties are diverse, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

8. This Court has declaratory judgment authority pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 and 2202, which provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

9.      There is an actual controversy, within the meaning of 28 U.S.C. § 2201 and 2202 between the Defendants and Mr. Dixon concerning whether Mr. Dixon resigned or was terminated and his entitlement to severance under the Employment Agreement.

10.      A declaratory judgment is necessary to determine whether Mr. Dixon resigned or was terminated and his entitlement to severance.

11.      Venue rests with this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this cause of action took place in Maryland.

12.      The Employment Agreement provides that the "Agreement shall be governed, construed and enforced in accordance with the laws of the State of Maryland…" and jurisdiction and venue rests in any state or federal court in Maryland in any dispute arising out of the Agreement.  *See* Exhibit A, Section 14.11.

## STATEMENT OF FACTS

13.      Section 1 of the Employment Agreement states, Mr. Dixon's employment shall renew "*unless (i) earlier terminated as provided in <u>Section 5</u> of this Agreement*, or (ii) *written notice of nonrenewal is given by either the Executive or the Company to the other party at least 90 days prior to the expiration of the then current Additional Term*." (Emphasis Added). *See* Exhibit A, Section 1.

14.      Section 2 of the Employment Agreement provides Mr. Dixon's title and reporting structure, stating, "[d]uring the Term, the Executive shall report directly to the Chief Growth Officer of the Company, currently Fred Funk (the **"CGO"**).  The Executive shall perform the customary duties of a President, CNO for a company of the size and nature of the Company and such attendant duties as may, from time to time, be reasonably requested of the Executive by the CGO." *See* Exhibit A, Recitals and Section 2.1.

15.     Section 5 of the Employment Agreement, in relevant part, states,

The Company may terminate the employment of the Executive at any time for Cause (as defined in Section 6.2 below) effectively upon the giving of notice.  The Company also may terminate the employment of the Executive without Cause effective immediately upon the giving of notice, subject to the provisions of Section 6.3 of this Agreement…*Upon termination of the Executive's Employment with the Company, the Company shall have no further liability to the Executive hereunder except* for (i) compensation earned and other benefits accrued to the date of such termination and (ii) *any severance pay and benefits that are required pursuant to Section 6 below. The effective date of termination shall be the termination date set forth in the notice of termination*." (Emphasis Added).  *See* Exhibit A, Section 5.

16.     Section 6.3 of the Employment Agreement, states,

*If the Executive's employment with the Company is terminated during the Initial Term or any Additional Term by the Company without Cause* or the Company gives the Executive a written notice of nonrenewal during the Initial Term or any Additional Term pursuant to Section 1, or the Executive voluntarily terminates his employment with the Company during the Initial Term or any Additional Term for Good Reason (as defined below), *the Company shall pay the Executive the following: (i) an aggregate amount equal to twelve (12) months of the Salary and bonus at the rate in effect on the last day of employment ("**Severance**"), payable to the Executive in twelve (12) equal monthly installments (less applicable payroll deductions and withholding amounts) and (ii) the Accrued Amounts*. (Emphasis Added).  *See* Exhibit A, Section 6.3.

17.     Section 6.3 of the Employment Agreement also states,

If the Executive (or his authorized representative, estate, or beneficiaries fail) to execute and deliver such general release within sixty (60) day period following date of the Executive's termination of employment, or timely revokes such general release following its execution, the Executive (or his authorized representative, estate or beneficiaries) shall not be entitled to the Severance or any portion thereof. Severance payments pursuant to this Section 6.3 shall not commence until such general release is executed and the revocation period has expired.  To the extent such sixty (60) day period spans two calendar years, regardless of the date the general release is executed and the revocation period expires, the Severance payments shall commence in the second calendar year. *For the avoidance of doubt, no Severance shall be payable pursuant to this Section 6.3 in the event of nonrenewal of the Agreement unless there is also a termination of the Executive's employment without Cause or for Good Reason prior to the expiration of the Term*. (Emphasis added).  *See* Exhibit A, Section 6.3.

18.     Mr. Dixon's employment continued through his 2nd Additional term, which ran from July 1st, 2022, through June 30th, 2023.

19.     Section 3 of the Employment Agreement states that "[f]or all services rendered by the Executive to the Company and for all obligations assumed by him pursuant to this Agreement, the Company shall, subject to the Executive's performance of such obligations, pay to the Executive the salary provided in this <u>Section 3</u> and shall provide other benefits as set in <u>Section 4</u> below." *See* Exhibit A, Section 3.

20.     Section 3.1 of the Employment Agreement states in relevant part that "[t]he Executive's Salary shall be Two Hundred Seventy-Five Thousand Dollars ($275,000) annually (less applicable payroll deductions and withholding amounts)." *See* Exhibit A, Section 3.1.

21.     Section 3.2 of the Employment Agreement states that "[t]he Executive's target bonus is forty percent (40%) of Salary. The annual bonus for 2019 shall be pro rated for the portion of the year the Executive was employed." *See* Exhibit A, Section 3.2.

22.     On October 18th, 2022, Mr. Dixon emailed the President of Intel Group of EverWatch, Brian Cooper, stating that "*[g]iven that the transaction has completed, let me know when you're available and are ready to discuss details regarding my transition from EverWatch*." (Emphasis Added).  *See* e-mail by Mr. Dixon to Brian Cooper, dated 18 October 2022 (attached, with Exhibit B).

23.     Mr. Cooper provided Mr. Dixon with possible days to discuss the "transition plan" with Sean Foster, the Chief Operating Officer of EverWatch.  On October 25, 2022, Mr. Foster emailed Mr. Dixon stating, "I'm available anytime to chat, so whatever works for you." *See* e-mail by Mr. Foster to Mr. Dixon, dated 25 October 2022 (attached, with Exhibit C).

24.     On November 4th, 2022, Mr. Foster email Mr. Dixon stating, "*I informed Bill Schuler of your plans this week and he asked that you provide a resignation letter*. I'm thinking that they would like to establish a date of departure." (Emphasis Added). *See* e-mail by Mr. Foster to Mr. Dixon, dated 04 November 2022 (attached, with Exhibit D).

25.     On November 7th, 2022, Mr. Dixon emailed Mr. Cooper with a request to further clarify the contents of the resignation letter requested by Mr. Schuler, which states, "*I'd like to chat about understanding a bit more about what you guys are looking for in a resignation letter*." (Emphasis Added).  *See* e-mail by Mr. Dixon to Mr. Cooper, dated 07 November 2022 (attached, with Exhibit E).

26.     On November 7th, 2022, Mr. Cooper responded to Mr. Dixon, stating,

> *My understanding is you have resigned and provided a date based on emails* and transition of program discusses. More than happy to discuss. *But it appears that's all that needs to be in the letter.* You told me about the same things in our discussions on the phone as well. When we spoke, you said when the deal closed you are resigning and that you were no longer supporting meeting or actives in the business. (Emphasis Added). *See* e-mail by Mr. Dixon to Mr. Cooper, dated 07 November 2022 (attached, with Exhibit E).

27.     On November 9th, 2022, Mr. Dixon emailed Mr. Cooper, stating, "**I have not resigned** nor provided a date but have rather continued to communicate consistently that any transition should be done in a way that is beneficial to both parties (company and executive) Reference my initial email content and subject 'Transition Planning'." (Emphasis Added).  *See* e-mail by Mr. Dixon to Mr. Cooper, dated 07 November 2022 (attached, with Exhibit E).

28.     On December 29th, 2022, Robert Silverman, the Chief Executive Officer of EverWatch and Executive Vice President of Booz Allen Hamilton, emailed Mr. Dixon, stating,

> Brian Cooper and Bill Schuler let me know you had questions about whether you would receive severance from EverWatch following your resignation. Based on the terms of your Employment Agreement, because you voluntarily resigned your employment with EverWatch, you are not entitled to receive severance payments.

Consistent with your Employment Agreement, EverWatch will continue your salary and benefits through your 90-day notice period, *running from the date you notified Sean Foster and Brian Cooper of your resignation, October 25, 2022, through January 23, 2023. Your last date of employment with EverWatch will be January 23, 2023*. (Emphasis Added).  *See* e-mail by Robert Silverman to Mr. Dixon to Brian Cooper, dated 29 December 2022 (attached, with Exhibit F).

29.     On January 10th, 2023, On January 11th, 2023, Human Resources and Security Representatives emailed Mr. Dixon, stating,

*Thank you for your service to ACES/EverWatch.  Attached is separation information for your review, sign and return to HR*.  Also, attached is a pre-exit IT equipment checklist if you have items to return to IT and information on converting your life insurance. (Emphasis Added). *See* e-mail by Human Resources and Security Representatives to Mr. Dixon, dated 11 January 2023 (attached, with Exhibit G).

30.     Human Resources and Security Representatives also emailed Mr. Dixon, which states that "*[w]e received notification that you are leaving the company effective, 1/23/2023. Sorry to see you go!  See debriefing instructions below*..." (Emphasis Added).  *See* e-mail by Human Resources and Security Representatives to Mr. Dixon, dated 11 January 2023 (attached, with Exhibit H).

31.     Mr. Dixon's severance is outlined in the Employment Agreement (Exhibit A, Sections 3.1 and 3.2), Disclosure Statement, and Waiver Agreement (Exhibit I, Schedule A) in the amount of $385,018.00.

## COUNT I:     DECLARATORY JUDGMENT

32.     Mr. Dixon incorporates the foregoing paragraphs as if fully stated herein.

33.     This Court has declaratory judgment authority pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 and 2202, which provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal

relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

34.     There is an actual controversy, within the meaning of 28 U.S.C. § 2201 and 2202 between the Defendants and Mr. Dixon concerning whether Mr. Dixon resigned or was terminated and his entitlement to severance under the Employment Agreement.

35.      A declaratory judgment is necessary to determine whether Mr. Dixon resigned or was terminated and his entitlement to severance.

36.     The Employment Agreement is a binding contract, which governs this dispute between Mr. Dixon and the Defendants.

37.     Mr. Dixon fully performed all of his obligations under the Employment Agreement. Mr. Dixon has continuously expressed his willingness to work with the Defendants to explore potential options in a way that is beneficial for both parties.

38.     Section 5 of the Employment Agreement is unambiguous and clearly states that "[t]he effective date of termination shall be the termination date set forth in the notice of termination."

39.     Mr. Dixon has neither resigned verbally or in writing nor has he provided a resignation letter with an effective date of termination in accordance with Section 5 of the Employment Agreement.

40.     The Defendants terminated Mr. Dixon's employment without Cause on December 29th, 2022, which sets forth Mr. Dixon's final date of employment effective January 23, 2023.

41.     The Defendants blatantly mischaracterized Mr. Dixon's initial inquiry as a resignation to avoid paying Mr. Dixon's severance benefits under Section 6.3 of the Employment Agreement.

42.     The Defendants unfairly prevented Mr. Dixon from receiving severance as outlined in the Employment Agreement, Disclosure Statement, and Waiver Agreement.

43.     Mr. Dixon asserts that he was terminated by the Defendants without Cause and entitled to severance as outlined in the Employment Agreement, Disclosure Statement, and Waiver Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in its favor against the Defendants and grant the following relief:

A.     Declaring that Mr. Dixon was terminated by the Defendants;

B.     Declaring that Mr. Dixon is entitled to severance in the amount of $385,018.00 as outlined in the Employment Agreement, Disclosure Statement, and Waiver Agreement;

C.     Award of attorneys' fees and costs of suit herein incurred;

D.     In the alternative, Mr. Dixon reserves the right to collect attorneys' fees and costs of this declaratory action if a breach of contract action is subsequently brought; and

E.     Granting Mr. Dixon such other relief as justice so requires.

Respectfully submitted,

/s/ Ryan T. Kennedy

_____
Ryan T. Kennedy, Esq., MD Bar No. 30279
Dunlap Bennett & Ludwig PLLC
8300 Boone Blvd., Suite 250
Vienna, VA 22182
Phone: (703) 436-8620
Email: rkennedy@dbllawyers.com

Date: February 22, 2023                    *Attorney for Plaintiff*